UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------

DEBORAH A. BAK,

|  |  |
|---|---|
| *Plaintiff,* | **COMPLAINT**<br>**AND JURY DEMAND** |

--against--


LANCASTER CENTRAL SCHOOL DISTRICT.

*Defendant.*
-------------------------------------------------------------------

Plaintiff, DEBORAH A. BAK, by and through her attorneys, LINDY KORN, ESQ. and RICHARD J. PERRY, ESQ., hereby complains of the Defendant, upon information and belief, as follows:

## NATURE OF THE CLAIMS

Plaintiff seeks the appropriate remedies and damages for discriminatory treatment based on age, gender, and retaliation based on Title VII of the Civil Rights Act of 1964, as amended.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and as conferred by 42 U.S.C. §§2000e5(f)(3) (amended 1972, 1978, and by the Civil Rights Act of 1991, Pub. L. No. 102-166).

2. Defendant is subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1391(b) as the acts and omissions giving rise to the claims in this complaint occurred within the Western District of New York.

## THE PARTIES

3.  At all times, Plaintiff, DEBORAH BAK ("Plaintiff"), is a resident of the State of New York, County of Erie.

4.  At all times, Defendant LANCASTER CENTRAL SCHOOL DISTRICT ("Defendant") is a school district and is located at 177 Central Avenue, Lancaster, New York 14086.

5.  On March 26, 1974, Defendant hired Plaintiff. Plaintiff continues to work for Defendant.

6.  At all times, Plaintiff is a non-exempt employee of Defendant. Plaintiff works as a Bus Driver at Defendant's location 295 Pleasant View, Lancaster, New York 14086.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.  Plaintiff has exhausted administrative remedies as a prerequisite to bringing this claim as follows:

8.  On July 22, 2013, Plaintiff filed a charge of discrimination with the New York State Division of Human Rights (DHR) and the Equal Employment Opportunity Commission (EEOC). The DHR assigned the case number as 10163480. The DHR cross-filed the Complaint with the EEOC as Federal Charge No. 16GB304334.

9.  Plaintiff received a Determination and Order After Investigation from the Division of Human Rights dated January 17, 2014, finding *No Probable Cause*.

10. On March 10, 2014, the EEOC mailed Plaintiff a 'Right to Sue' letter proving that she has exhausted her administrative remedies.

## FACTUAL ALLEGATIONS

11. Plaintiff is female.

12. Plaintiff was born January 7, 1951 and is over 40 years of age.

2

13. Plaintiff is employed by the District as a School Bus Driver.

14. Plaintiff has been a School Bus Driver for the District for over 40 years, as the District hired her on March 26, 1974. Plaintiff is the most senior bus driver in the garage.

15. Plaintiff's supervisor is Robert W. Mowry, the District's Transportation Supervisor of Schools ("Supervisor Mowry"). Mr. Mowry became the District's Transportation Supervisor of Schools in approximately July 2002.

16. Upon information and belief, Supervisor Mowry left his previous employer, Niagara Wheatfield Central School District, after a female employee who Mowry supervised, sued her employer, alleging that Mowry sexually harassed her.

17. Supervisor Mowry treats employees disparately based on their age and gender.

18. One bitterly cold, snowy morning in January 2005, Plaintiff came to work as a stand-by driver. When it turned out that no stand-by drivers were needed, Plaintiff double-checked with Supervisor Mowry that there were no bus runs for her to do before clocking out. Supervisor Mowry stopped Plaintiff and told her to pull up a bus and wash it. It was 6 a.m. and pitch dark.

19. Bus drivers do not wash buses on bitterly cold, snowy mornings in the pitch dark because the water would freeze and because the harsh conditions would make it an unsafe activity. No supervisor had ever asked Plaintiff to wash a bus in such conditions.

20. Plaintiff was dressed to drive a bus, not to wash a bus on a bitterly cold, snowy morning. She told Supervisor Mowry she could not wash a bus that morning and asked if she could leave. Supervisor Mowry was very angry.

21. Upon information and belief, Supervisor Mowry did not ask other bus drivers to wash buses in such conditions.

22. The District required bus drivers to periodically attend safety meetings. Bus drivers could choose to attend a day session or an evening session. Like many other bus drivers, Plaintiff preferred and always chose to attend the evening session so that she would not have to give up her bus runs during the day and the pay she would get from doing the runs.

23. Supervisor Mowry was rude and hostile to the older, female employees. He got impatient with them whenever they asked him questions, he replied in monosyllabic answers, and he was unfriendly. In contrast, Supervisor Mowry was friendlier and more respectful of male employees and younger employees, particularly younger female employees.

24. In approximately January 2008, Supervisor Mowry ordered Plaintiff to attend the day session of the safety meeting, against her wishes. Supervisor Mowry also ordered Dottie Cole, a bus aide, to attend the day session. Upon information and belief, Supervisor Mowry did not order any male bus drivers or male bus driver aides to attend the day session of the safety meeting against their wishes.

25. Director of Finance and Support Services, Richard D'Arcy ("Director D'Arcy"), told Supervisor Mowry that he could not order Plaintiff and Ms. Cole to attend the morning session of the safety meeting and that he should allow Plaintiff and Ms. Cole to attend the evening session. However, Supervisor Mowry intentionally did not inform Plaintiff and Ms. Cole that Director D'Arcy said they could attend the evening session, so both women attended the day session.

26. Both Plaintiff and Ms. Cole grieved Supervisor Mowry's discriminatory conduct in prohibiting them from attending the evening session of the safety meeting. Plaintiff won her grievance and was awarded two hours of pay. Upon information and belief, Ms. Cole also won her grievance.

27. In September 2010, Plaintiff bid on a bus and a bus run for the 2010-2011 school year. The bus on which Plaintiff bid was a newer addition to the fleet and was equipped with air conditioning.

4

Because Plaintiff had seniority over all of the other bus drivers, she had senior bidding rights and got the bus she bid on.

28. Most bus drivers spend between 5-8 hours a day on a bus. Thus, just as an employee who works in a building likes to work in a comfortable office, a bus driver likes to drive a comfortable bus. One of the privileges of having seniority in the bus garage is the ability to bid on and get the better, more comfortable buses.

29. In November 2010, however, Supervisor Mowry took the new bus away from Plaintiff and gave it to a younger driver. In its place, Supervisor Mowry gave Plaintiff a less desirable bus that was notoriously hard to shift and put into emergency brake, especially for the female bus drivers.

30. Plaintiff suffers from Carpal Tunnel syndrome. The bus was indeed very difficult to shift and it hurt Plaintiff's wrists. Supervisor Mowry made fun of Plaintiff's difficulties with the bus, saying to others in the bus garage, "Wah wah…if that bus hurts her maybe she'll go out on leave."

31. In December 2010, Supervisor Mowry once again changed Plaintiff's bus. This time, Supervisor Mowry gave Plaintiff a bus that did not have heat.

32. Because the bus lacked heat, ice formed on the inside of the windows. Plaintiff could see her breath. Plaintiff dressed for work every day as if she worked outside. She wore mittens, long johns and a Snuggie.

33. Plaintiff repeatedly complained during the winter of 2010/2011 that the bus was too cold and asked for the heating to be fixed, but Supervisor Mowry refused to do so. It was only after winter was nearly over, in early March 2011, that Supervisor Mowry finally allowed the heating to be fixed. Upon information and belief, Supervisor Mowry forbad Paul Bannochie, the District Head Mechanic, from fixing the heat on Plaintiff's bus.

34. In December 2010, the District was drug testing bus drivers, including Plaintiff. However, when it was her turn to be tested, Plaintiff could not quickly provide the urine sample needed for the test.

35. Supervisor Mowry was angry that Plaintiff was unable to produce urine. Eventually, Plaintiff was able to produce urine for the drug test, after which she asked Supervisor Mowry if she should do the next run now. Supervisor Mowry replied in an angry, demeaning tone, "For doing that, I should make you wash a bus." Afterwards, Supervisor Mowry hollered in a loud voice to Plaintiff, go into the driver's room and sit down. Plaintiff was humiliated.

36. In February 2011, two desirable late bus runs became available. The run should have gone up on the board for all the drivers to see. Given Plaintiff's seniority, had the run been posted and had she bid on it, she would have gotten it. Supervisor Mowry knew that Plaintiff had seniority bidding rights. Instead of posting the run, Supervisor Mowry handed it over to other employees.

37. Plaintiff took initial steps to grieve Supervisor Mowry's failure to post the bid. Soon after she did so, Respondent gave Plaintiff the run, although Respondent failed to compensate Plaintiff for the lost wages during the time that she did not have the run.

38. In March 2011, on a cold, snowy day, Plaintiff's bus would not start. As she had done for 20-25 years, and as all the other bus drivers did when their buses broke down, Plaintiff called in on the service radio to inform the garage that her bus would not start. Every time such a call for help went out, the garage would tell the bus driver which replacement bus they should take. If the bus driver's key did not work on the replacement bus, someone from the bus garage would drive over with another key. Plaintiff asked over the radio which bus the garage would like her to take. Nobody answered. She asked again and nobody answered. So Plaintiff got out of her bus and walked to the garage, approximately 100 yards away.

39. When Plaintiff reached the garage, the head mechanic, Greg Phillips, took her aside and told her, "Supervisor Mowry hates your guts, doesn't he?" Greg told Plaintiff that when she radioed for help, Supervisor Mowry had called him and told him, "Don't give Deb Bak a bus over the radio. Make her walk all the way over here and ask for one."

40. In January 2013, Supervisor Mowry selected Plaintiff to transport a group of children to another school, during what was traditionally a period of rest (otherwise known as a lay over) for the bus drivers between regularly scheduled bus runs. In the past, less senior bus drivers were chosen for assignments such as these. However, Supervisor Mowry selected Plaintiff to take the run, the most senior bus driver, out of approximately 30 less senior drivers who were available for the run.

41. In February 2013, Plaintiff was doing two Harkness runs. One in the morning from 9:24 to 11:24 and one in the afternoon from 11:54 to 1:54. Like all bus drivers, pursuant to her contract, Plaintiff got paid a minimum of two hours for each bus run no matter how long the run took. Ordinarily, Plaintiff finished her morning run at 10:30 am. Plaintiff would then punch back in at 11:54 for her midday run.

42. Supervisor Mowry added to Plaintiff's bus run a student to pick up from home before heading over to the high school for her midday Harkness run. Supervisor Mowry made Plaintiff punch in at 11:24 am, even though she did not need to punch in until 11:30 am in order to pick up the student from home and be at the high school at the right time. By making Plaintiff punch in 6 minutes earlier than she actually needed to, Supervisor Mowry combined Plaintiff's morning and midday runs into a single run, resulting in a lost of 30 to 35 minutes of pay for Plaintiff every day.

43. It did not make sense to combine the bus runs, because Plaintiff did not need to start her bus run at 11:24 am. By leaving at 11:24 am, Plaintiff arrived at the high school six to seven minutes too early. Therefore, when Plaintiff arrived at the high school, she had to shut off her bus and wait until the high school students were released to the buses. "Why do we get here and sit for 7 minutes?" the one student on Plaintiff's bus would ask.

44. Plaintiff grieved Supervisor Mowry's actions regarding the combining of her bus runs.

45. Supervisor Mowry was angry that Plaintiff had grieved his actions, so in February 2013, Supervisor Mowry told Plaintiff she could no longer go home in between her bus runs. Instead, Supervisor Mowry required Plaintiff to remain sitting in the bus garage from 10:30 am, after she finished her morning Harkeness run, until 11:24, when Mowry required Plaintiff to punch in and begin her midday Harkness run. In the 39 years Plaintiff had worked for the district, she had never been made to sit in the bus garage between runs. Moreover, upon information and belief, Supervisor Mowry did not require any other bus drivers to sit in the bus garage after they finished their scheduled runs on a regular basis.

46. Supervisor Mowry did not give Plaintiff anything to do while she remained in the bus garage in between her bus runs, other than to sit. Plaintiff was humiliated and afraid. Her coworkers saw her sitting in the garage and asked her if she was being punished for something.

47. Plaintiff sat in the bus garage for approximately two-and-a-half weeks. After Plaintiff began to prepare her paperwork to grieve Supervisor Mowry's actions, Barb Nichter, Head Bus Driver, told Plaintiff that Supervisor Mowry no longer required Plaintiff to sit in the bus garage.

48. In April 2013, Plaintiff brought her concerns about the hostile work environment and Supervisor Mowry's bullying to the attention of her union.

49. Upon information and belief, other female employees have filed complaints of discrimination based on age and/or gender against Supervisor Mowry, including Mary Refermet, Debbie Flowers, Darlene Sherwood, Laura Paulter and Gina Scoglione.

50. Upon information and belief, five female secretaries left Respondent's employment because of Supervisor Mowry's discriminatory treatment: Karen Schafer, Cindy Kershaw, Gail Trznadel, Joy Paconowski and Darlene Sherwood.

51. Respondent's actions have caused Plaintiff significant emotional and physical harm.  She is losing her hair.  She cannot sleep at night.  A job that she used to love has now become a source of severe anxiety and stress.

52. Defendant's actions were intentional and intended to harm Plaintiff.

53. As a result of Defendant's actions, Plaintiff experienced fear, severe humiliation, degradation, embarrassment, and emotional distress.

54. As a result of Defendant's actions, Plaintiff has suffered and will continue to suffer the loss of income and other compensation that such employment entails.  Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

55. As a result of Defendant's actions, Plaintiff has been damaged in an amount that exceeds the jurisdiction limits of all lower Courts.

56. Defendant's conduct has been malicious, willful, and outrageous.  As such, Plaintiff demands punitive damages as against the Defendant.

**FIRST CAUSE OF ACTION:**
**Sex based on a Hostile Work Environment in Violation of Title VII of the Civil Rights Act**
**of 1964, as amended**

57. Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

58. To prevail on a claim of sexual harassment based on a hostile work environment, a plaintiff must establish: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Petrosino v. Bell,* 385 F.3d 210 (2d Cir. 2004), citing *Mack v. Otis Elevator Co.,* 326 F.3d at 122 (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 436 (2d Cir.1999)).

59. Defendant violated the law by:

    a. Making Plaintiff wash her bus on a bitterly cold, snowy morning at 6am, despite the fact that no other supervisor had ever asked Plaintiff to do so in such dangerous conditions;

    b. Upon information and belief, Supervisor Mowry did not ask other bus drivers to wash buses in such conditions.

    c. Supervisor Mowry was rude and hostile to the older, female employees. He got impatient with them whenever they asked him questions, he replied in monosyllabic answers, and he was unfriendly. In contrast, Supervisor Mowry was friendlier and more respectful of male employees and younger employees, particularly younger female employees.

d.  Supervisor Mowry took the new bus away from Plaintiff and gave it to a younger driver.  In its place, Supervisor Mowry gave Plaintiff a less desirable bus that was notoriously hard to shift and put into emergency brake, especially for the female bus drivers.

e.  Plaintiff suffers from Carpal Tunnel syndrome.  The bus was indeed very difficult to shift and it hurt Plaintiff's wrists.  Supervisor Mowry made fun of Plaintiff's difficulties with the bus, saying to others in the bus garage, "Wah wah…if that bus hurts her maybe she'll go out on leave."

f.  In March 2011, on a cold, snowy day, Plaintiff's bus would not start.  As she had done for 20-25 years, and as all the other bus drivers did when their buses broke down, Plaintiff called in on the service radio to inform the garage that her bus would not start.  Every time such a call for help went out, the garage would tell the bus driver which replacement bus they should take.  If the bus driver's key did not work on the replacement bus, someone from the bus garage would drive over with another key or give them a bus number over the radio.  Plaintiff asked over the radio which bus the garage would like her to take. Nobody answered.  She asked again and nobody answered.  So Plaintiff got out of her bus and walked to the garage, approximately 100 yards away.

g.  When Plaintiff reached the garage, the head mechanic, Greg Phillips, took her aside and told her, "Supervisor Mowry hates your guts, doesn't he?"  Greg told Plaintiff that when she radioed for help, Supervisor Mowry had called him and told him, "Don't give Deb Bak a bus over the radio. Make her walk all the way over here and ask for one."

h.  In February 2013, Plaintiff was doing two Harkness runs. One in the morning from 9:24 to 11:24 and one in the afternoon from 11:54 to 1:54. Like all bus drivers, pursuant to her contract, Plaintiff got paid a minimum of two hours for each bus run no matter how long the run took. Ordinarily, Plaintiff finished her morning run at 10:30 am. Plaintiff would then punch back in at 11:54 for her midday run.

i.  Supervisor Mowry combined Plaintiff's morning and midday runs into a single run, resulting in a lost of 30 to 35 minutes of pay for Plaintiff every day.

j.  Supervisor Mowry did not give Plaintiff anything to do while she remained in the bus garage in between her bus runs, other than to sit. Plaintiff was humiliated and afraid. Her coworkers saw her sitting in the garage and asked her if she was being punished for something.

k.  Plaintiff sat in the bus garage for approximately two-and-a-half weeks.

l.  In April 2013, Plaintiff brought her concerns about the hostile work environment and Supervisor Mowry's bullying to the attention of her union.

## SECOND CAUSE OF ACTION:
### Age Discrimination in Violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et. seq.

60. Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

61. To establish a prima facie case of discrimination under the ADEA, the plaintiff must show that: (1) she was within the protected age group, (2) she was qualified for the job, (3) she suffered an adverse employment action; and, (4) the adverse employment action occurred under

circumstances giving rise to an inference of age discrimination. *Pena v. Brattleboro Retreat,* 702 F.2d 322 (2nd Cir. 1983).

62. Defendant violated the law by:

    m. Supervisor Mowry took the new bus away from Plaintiff and gave it to a younger driver. In its place, Supervisor Mowry gave Plaintiff a less desirable bus that was notoriously hard to shift and put into emergency brake, especially for the female bus drivers.

    n. Plaintiff suffers from Carpal Tunnel syndrome. The bus was indeed very difficult to shift and it hurt Plaintiff's wrists. Supervisor Mowry made fun of Plaintiff's difficulties with the bus, saying to others in the bus garage, "Wah wah…if that bus hurts her maybe she'll go out on leave."

    o. In December 2010, Supervisor Mowry once again changed Plaintiff's bus. This time, Supervisor Mowry gave Plaintiff a bus that did not have heat. Because the bus lacked heat, ice formed on the inside of the windows. Plaintiff could see her breath. Plaintiff dressed for work every as if she worked outside. She wore mittens, long johns and a Snuggie. Plaintiff repeatedly complained during the winter of 2010/2011 that the bus was too cold and asked for the heating to be fixed, but Supervisor Mowry refused to do so. It was only after winter was nearly over, in early March 2011, that Supervisor Mowry finally allowed the heating to be fixed.

    p. In February 2011, two desirable late bus runs became available. The run should have gone up on the board for all the drivers to see. Given Plaintiff's seniority, had the run been posted and had she bid on it, she would have gotten it. Supervisor Mowry knew

that Plaintiff had seniority bidding rights.  Instead of posting the run, Supervisor Mowry handed it over to other employees.

q.  Plaintiff took initial steps to grieve Supervisor Mowry's failure to post the bid.  Soon after she did so, Respondent gave Plaintiff the run, although Respondent failed to compensate Plaintiff for the lost wages during the time that she did not have the run.

## THIRD CAUSE OF ACTION:
### Hostile Work Environment based on Age in Violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et. seq.

63. Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

64. An actionable discrimination claim based on hostile work environment under the ADEA is one for which the workplace was so permeated with severe, pervasive discrimination so as to alter the conditions of the Plaintiff's employment.  *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999).

65. The determination of hostility depends on whether a reasonable person would find the work environment to be hostile and whether plaintiff's subjectively perceived it to be so.  *Kassner v 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 240 (2d. Cir. 2007).

66. Defendant, through action or failure to act, engaged in severe and pervasive discrimination based on age, which is included but is not limited to:

a.  Making Plaintiff wash her bus on a bitterly cold, snowy morning at 6am, despite the fact that no other supervisor had ever asked Plaintiff to do so in such dangerous conditions;

14

b. Upon information and belief, Supervisor Mowry did not ask other bus drivers to wash buses in such conditions.

c. Supervisor Mowry was rude and hostile to the older, female employees. He got impatient with them whenever they asked him questions, he replied in monosyllabic answers, and he was unfriendly. In contrast, Supervisor Mowry was friendlier and more respectful of male employees and younger employees, particularly younger female employees.

d. Supervisor Mowry took the new bus away from Plaintiff and gave it to a younger driver. In its place, Supervisor Mowry gave Plaintiff a less desirable bus that was notoriously hard to shift and put into emergency brake, especially for the female bus drivers.

e. Plaintiff suffers from Carpal Tunnel syndrome. The bus was indeed very difficult to shift and it hurt Plaintiff's wrists. Supervisor Mowry made fun of Plaintiff's difficulties with the bus, saying to others in the bus garage, "Wah wah…if that bus hurts her maybe she'll go out on leave."

f. Supervisor Mowry again changed Plaintiff's bus. Supervisor Mowry gave Plaintiff a bus that did not have heat. Because the bus lacked heat, ice formed on the inside of the windows. Plaintiff could see her breath. Plaintiff wore mittens, long johns, and a Snuggie. Plaintiff repeatedly complained that the bus was too cold and asked for the heating to be fixed, but Supervisor Mowry refused to do so. It was only after winter was nearly over, in early March 2011, that Supervisor Mowry finally allowed the heating to be fixed.

g. In February 2013, Plaintiff was doing two Harkness runs. One in the morning from 9:24 to 11:24 and one in the afternoon from 11:54 to 1:54. Like all bus drivers, pursuant to her contract, Plaintiff got paid a minimum of two hours for each bus run no matter how long the run took. Ordinarily, Plaintiff finished her morning run at 10:30 am. Plaintiff would then punch back in at 11:54 for her midday run.

h. Supervisor Mowry added to Plaintiff's bus run a student to pick up from home before heading over to the high school for her midday Harkness run. Supervisor Mowry made Plaintiff punch in at 11:24 am, even though she did not need to punch in until 11:30 am in order to pick up the student from home and be at the high school at the right time. By making Plaintiff punch in 6 minutes earlier than she actually needed to, Supervisor Mowry combined Plaintiff's morning and midday runs into a single run, resulting in a lost of 30 to 35 minutes of pay for Plaintiff every day.

i. It did not make sense to combine the bus runs, because Plaintiff did not need to start her bus run at 11:24 am. By leaving at 11:24 am, Plaintiff arrived at the high school six to seven minutes too early.

j. Supervisor Mowry required Plaintiff to remain sitting in the bus garage from 10:30 am until 11:24, when Mowry required Plaintiff to punch in and begin her midday Harkness run. In the 39 years Plaintiff had worked for the district, she had never been made to sit in the bus garage between runs.

16

k.  Supervisor Mowry did not give Plaintiff anything to do while she remained in the bus garage in between her bus runs, other than to sit.  Plaintiff was humiliated and afraid.

## FOURTH CAUSE OF ACTION:
### Retaliation for Opposing Discrimination based on Sex and Age in Violation of Title VII of the Civil Rights Act of 1964, as amended, and the ADEA

67. Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

68. To establish a prima facie case for retaliation for opposing discrimination, the plaintiff must show (1) that she engaged in protected activity, (2) that the employer was aware of the activity, (3) that the employer took adverse actions, and; (4) that a causal connection exists between the protected activity and the adverse action.  *Cifra v. General Electric Co.,* 252 F.3d 205, 216 (2d Cir. 2001).

69. As to the first element, Plaintiff complained multiple times to Defendant about Supervisor Mowry's discriminatory actions towards Plaintiff.  As to the second element, Defendant was aware of Plaintiff's grievances through her Union of Supervisor Mowry's actions.  As to the third element, Defendant took multiple adverse actions, including changing the terms and conditions of Plaintiff's employment, when Plaintiff complained about Supervisor Mowry. As to the fourth and final element, a causal connection existed between Plaintiff's grievances about Supervisor Mowry and the adverse actions taken against her, as listed in this complaint.

## INJURY AND DAMAGES

70. As a result of the acts and conduct complained herein, Plaintiff has suffered and will continue to suffer out-of-pocket medical expenses, future pecuniary losses, emotional pain, suffering, inconvenience, injury to her reputation, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment against the Defendant:

a. Declaring that the Defendant engaged in unlawful employment practice prohibited by Title VII, as amended, and the Age Discrimination in Employment Act (ADEA), and that the Defendant discriminated against the Plaintiff on the basis of her sex and age discrimination and retaliated against her;

b. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

c. Awarding Plaintiff punitive damages;

d. Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of this action;

e. Awarding Plaintiff such other and further relief that this Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

WHEREFORE, Plaintiff demands judgment against Defendant, jointly and severally in an amount to be determined at trial plus interest, punitive damages, attorney's fees, costs, and disbursement of action, and for other such relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) Fed. R. Civ. P., Plaintiff hereby demands a trial by jury for all

issues triable of right by a jury in this case.


Dated:          May 28, 2014
                Buffalo, New York



                          **LINDY KORN, ESQ.**
                          **RICHARD J. PERRY, ESQ.**
                          *Attorneys for Deborah A. Bak*



                          By: _____
                              Lindy Korn, Esq.
                              The Law Office of Lindy Korn, PLLC
                              535 Washington Street, Ninth Floor
                              Buffalo, New York 14203
                              716-856-5676
                              lkorn@lkorn-law.com